IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 1:22-CR-376 |
| | : | |
| v. | : | (Judge Neary) |
| | : | |
| RUDY MENDOZA, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

Presently before the court is defendant Rudy Mendoza's motion to suppress statements and prison calls. (Doc. 51). Mendoza seeks to suppress statements made to correctional officers while incarcerated at the United States Penitentiary Canaan Federal Correctional Complex ("USP Canaan") following an incident that led to the death of his cellmate, Ricardo Martinez, and his recorded prison calls regarding the incident. (Doc. 51). The motion has been fully briefed and is ripe for disposition. (Docs. 52, 63, 69).

For the reasons set forth below, the court will deny Mendoza's motion.

## I.   Factual Background and Procedural History[1]

On October 19, 2021, a federal grand jury returned a two-count indictment charging Mendoza with second-degree murder, in violation of 18 U.S.C. § 1111(a),

---

[1] The following factual narrative derives from testimonial and documentary evidence adduced during the suppression hearing held in this matter on March 26, 2026, together with the parties' briefing. Citations to the March 26 rough hearing transcript are abbreviated as "Hr'g Tr. ___." Pagination of the rough transcript may vary from that of the official transcript. Hearing exhibits are cited as "Gov't Ex. __." This recitation of facts reflects the court's credibility determinations.

and manslaughter, in violation of 18 U.S.C. § 1112(a). (Doc. 1). The charges arise from the death of Mendoza's cellmate, Ricardo Martinez, at USP Canaan. (Id.).

At the time of the incident, Mendoza and Martinez were housed together in the Special Housing Unit ("SHU") at USP Canaan. (Doc. 51 ¶¶ 2-3). On July 30, 2019, at approximately 6:43 a.m., Corrections Officer (C.O.) James Santarelli responded to an inmate duress call from the cell. (Hr'g Tr. 7:18-8:19; Gov't Ex. 1 at 1:52-1:56). When Santarelli asked whether Martinez was alright, Mendoza allegedly responded, "No, everything is not ok" and "you gotta get somebody down here." (Doc. 51 ¶ 5).

C.O. Cory Vrabel arrived outside the cell at approximately 6:45 a.m. and ordered Mendoza to "cuff up," with which Mendoza complied. (Hr'g Tr. 42:13-22). Mendoza was removed from his cell and transported to a nearby holding cell within the SHU. (Id. 22:9-23:4; 24:5-8). His handcuffs were then removed upon placement in the holding cell. (Id. 24:9-15). While in the holding cell, C.O. Santarelli supposedly asked, "What happened did you wake up and he wasn't breathing?" and Mendoza allegedly responded, "I didn't do anything. I'm not trying to catch a charge, I gotta talk to an attorney." (Doc. 63 at 4). At approximately 7:06 a.m., after assisting in transporting Martinez to health services, C.O. Vrabel returned and asked Mendoza about what happened, to which Mendoza allegedly responded, "Disrespect, I want a lawyer." (Hr'g Tr. 27:13-28:11; Gov't Ex. 3 at 2).

While Mendoza was incarcerated, he made numerous recorded prison calls to family and/or friends regarding the incident with Martinez. (Doc. 51 ¶ 15). At the

beginning of each call, a recording is played to both the inmate and the other speaker, which states: "This call is from Rudy Mendoza. And (sic) inmate at a federal prison. This call is being recorded and is subject to monitoring." (Gov't Ex. 5 at 1; Hr'g Tr. 63:11-64:7)). Inmates also receive an "Inmate Information Handbook" upon arrival at USP Canaan, which provides, "[t]elephone calls are subject to monitoring and recording by institution staff." (Gov't Ex. 6 at 10).

On September 8, 2025, Mendoza filed a motion to suppress all statements made to law enforcement and any recorded prison calls following the incident. (Doc. 51). The court held a hearing on the motion on March 26, 2026, at which C.O. Vrabel and Officer Ryan Boynton testified.

## II.    Discussion

Mendoza argues any statements he made to prison officials on the date of the incident should be inadmissible because he was in custody at the time and he had not been given a Miranda warning. (Doc. 52 at 3). Further, he argues his Fourth Amendment rights were violated when recordings of his personal phone calls he made while incarcerated were disclosed to the government. (Id. at 8-9). Both arguments fail.

### A. Mendoza's Statement on July 30, 2019

Mendoza seeks to suppress the statement he made on July 30, 2019, in response to C.O. Vrabel's question, "What happened?" to which Mendoza responded, "Disrespect, I want a lawyer." (Doc. 51 ¶ 10). As it is undisputed that no one Mirandized Mendoza, the dispositive questions regarding the admissibility of his

statements to prison officials are whether he was in custody and whether he was subject to custodial interrogation.

As a general rule, the burden of proof is on defendants seeking to suppress evidence. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). Once that burden is met, the government must prove by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted without Miranda warnings. See Colorado v. Connelly, 479 U.S. 157, 168 (1986); U.S. v. DeSumma, 44 F.Supp.2d 700, 703 (E.D. Pa. 1999).

### 1. Custody

Mendoza contends that Miranda warnings were required because he was "involuntarily removed from his cell, cuffed behind his back and taken to another holding cell within the SHU." (Doc. 52 at 5). The government responds that Mendoza was not in custody because there was no significant change in Mendoza's settings, no prolonged questioning, and no indicia of coercion. (Doc. 63 at 15).

The Fifth Amendment's prohibition against compelled self-incrimination requires Miranda warnings be administered before custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444-45 (1966); Edwards v. Arizona, 451 U.S. 477, 481-82 (1981). A person is in custody when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam)).

In the prison context, the Supreme Court has held that an inmate is not automatically in "custody" within the meaning of Miranda when they are in the general prison population. Howes v. Fields, 565 U.S. 499, 517 (2012); accord United States v. Gojah, 553 F. Appx. 159, 161 (3d Cir. 2014) (nonprecedential). Miranda warnings are required in prison interrogations only when there is a "change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." United States v. Conley, 779 F.2d 970, 973 (4th Cir. 1985)) (quoting Cervantes v. Walker, 589 F.2d 424, 428 (9th Cir. 1978)).

Based on the totality of the circumstances, the court finds that Mendoza was not in custody for Miranda purposes. Nothing in the record indicates that Mendoza was restrained beyond "the ordinary restrictions of prison life." See Howes, 565 U.S. at 511. Inmates in the SHU are routinely handcuffed when leaving their cells pursuant to prison policy, and Mendoza's handcuffs were removed shortly after he was placed in a separate holding cell. (Hr'g Tr. 14:13-19; 24:9-22).

The holding cell Mendoza was moved to was within the same SHU area where he was already confined, and confinement in a locked cell was the normal and expected restraint on freedom as a consequence of incarceration. (Id. at 35:13-20). In fact, the temporary holding cell was "more open" than the cell Mendoza was normally housed in, providing him with greater freedom of movement. (Id. at 53:1-16). Based upon the facts developed at the evidentiary hearing, none of the minor changes to Mendoza's conditions of confinement imposed the type of restraint associated with formal arrest. Therefore, he was not subjected to any "added

imposition" on his freedom of movement as required to establish custody. See, e.g., Conley, 779 F.2d at 973.

Mendoza relies on United States v. Mattox, No. 3:17-CR-8, 2018 WL 3622777 (M.D. Pa. July 30, 2018), in which the court found that an inmate questioned in the SHU was "in custody" for Miranda purposes. However, Mattox is distinguishable. There, the defendant had not been regularly housed in the SHU but was placed there for discipline for two weeks before being questioned by a lieutenant. Id. at *5. Additionally, the defendant remained restrained throughout the interview. Id.

Here, by contrast, there is nothing in the record establishing Mendoza was placed in the SHU as a form of punishment for anything dealing with Martinez. C.O. Vrabel questioned Mendoza approximately 22 minutes after officers first learned of Martinez's injuries, and Mendoza's handcuffs were removed once he was placed in the holding cell. (Hr. Tr. 24:11-22). Mendoza was not questioned by a lieutenant for disciplinary purposes, but by a correctional officer who asked a single question: "What happened?" Further, Mendoza was removed from his cell not for punishment, but "to get him out of the way so [officers] could respond to the emergency." (Id. 35:23-36:2).

Accordingly, Mendoza was not in custody when questioned by C.O. Vrabel in the holding cell, and Miranda warnings were not required.

### 2.    Interrogation

Even if Mendoza were deemed to have been in custody, his statements would nonetheless be admissible because he was not subjected to interrogation under

6

Miranda. An "interrogation" is defined as "conduct intentionally designed to evoke a confession, as well as any conduct an officer should reasonably have foreseen would elicit an inculpatory response." United States v. Bonner, 469 F. A'ppx 119, 126 (3d Cir. 2012) (nonprecedential) (citing Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980)). General "on-the-scene questioning" concerning the facts and circumstances surrounding a crime or general questioning during the fact-finding process does not trigger Miranda warnings. See, e.g., Miranda, 384 U.S. at 477–78; Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994).

Courts in other circuits have applied the on-the-scene questioning doctrine in the prison context. See, e.g., Garcia, 13 F.3d at 1491-92 (holding that an officer's question about a fire in an inmate's cell was general on-the-scene questioning, not interrogation); United States v. Scalf, 725 F.2d 1272, 1276 (10th Cir. 1984) (holding that a conversation with defendant after an alleged assault on fellow inmate did not require Miranda warnings because it was an on-the-scene inquiry to find out what had happened and not interrogation); Wilson v. Cain, 641 F.3d 96, 104 (5th Cir. 2011) (questioning by prison staff following an altercation to ensure safety of general prison population was on-the-scene questioning).

Although not binding, the court finds these decisions highly persuasive, and, applying their reasoning here, concludes that C.O. Vrabel's question constituted general on-the-scene questioning that did not require Miranda warnings. C.O. Vrabel questioned Mendoza shortly after an incident involving an unresponsive and severely injured inmate. (See Gov't Ex. 3). Nothing in the record indicates that C.O.

Vrabel's question was intentionally designed to evoke a confession or elicit an incriminating response. Rather, C.O. Vrabel testified that he spoke with Mendoza "[j]ust to find out what happened because . . . they [Mendoza and Martinez] got along for as long as [he] knew," and confirmed that he was not acting as an investigator during their interaction. (Hr'g Tr. 28:12-16; 29:8-15).

As a correctional officer charged with the care of all inmates, C.O. Vrabel's question was nothing more than an "on-the-scene" inquiry made in the course of his duties responding to the incident. See Scalf, 725 F.2d at 1276. Accordingly, the court finds that C.O. Vrabel's conversation with Mendoza did not constitute "interrogation" under Miranda, and Mendoza's statement will not be suppressed.

Because the court finds no custodial interrogation, it need not address the government's argument that the public safety exception to Miranda applies.

## B. Prison Calls

The court next addresses Mendoza's Fourth Amendment challenge to his recorded prison calls. Specifically, Mendoza seeks to suppress recorded telephone calls made while incarcerated, arguing that he had a reasonable expectation of privacy in his phone calls and that the calls were unlawfully obtained without a warrant. (Doc. 52 at 6-11). Although Mendoza concedes that the prison provides inmates with notice that their calls are being monitored and recorded, he contends his right to privacy was violated when his recorded calls were provided to the government. (Doc. 51 ¶¶ 19, 21).

The Fourth Amendment protects information in which one has a "constitutionally protected reasonable expectation of privacy." United States v. Shavers, 693 F.3d 363, 389 (3d Cir. 2012), vacated on other grounds, 570 U.S. 913 (2013) (quoting New York v. Class, 475 U.S. 106, 112 (1986)). Determining whether an individual's expectation of privacy is justifiable involves two inquiries: "(1) whether the individual demonstrated an actual or subjective expectation of privacy in the subject of the search or seizure; and (2) whether this expectation of privacy is objectively justifiable under the circumstances." Free Speech Coal., Inc. v. Att'y Gen., 677 F.3d 519, 543 (3d Cir. 2012) (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)). In the prison context, the Third Circuit has held that inmates do not have a reasonable expectation of privacy in their telephone conversations when put on notice that their calls are monitored and recorded. Shavers, 693 F.3d at 389-90; United States v. Jarmon, 14 F.4th 268, 272-73 (3d Cir. 2021).

Here, USP Canaan's telephone systems notify inmates that their calls on prison telephones are subject to monitoring and recording. All calls placed by an inmate on the prison telephone system begin with an express warning to both the inmate and the other speaker that "[the] call is being recorded and is subject to monitoring." (Hr'g Tr. 63:5-13). Inmates also receive an "Inmate Information Handbook" upon arrival at USP Canaan, which provides that "[t]elephone calls are subject to monitoring and recording by institution staff." (Gov't Ex. 6 at 10). Mendoza certified in a signed form that he received the inmate handbook on

9

January 22, 2015, and he was instructed of the rules and regulations concerning telephone procedures. (Gov't Ex. 8).

Given the nature of incarceration and the repeated notices provided to inmates regarding call monitoring and recording, Mendoza cannot demonstrate that he had a subjective expectation of privacy in his prison calls. See Shavers, 693 F.3d at 390; Free Speech Coal., Inc., 677 F.3d at 543. And even if he could, he would be unable to demonstrate that his belief was objectively justifiable under the circumstances. See Free Speech Coal., Inc., 677 F.3d at 543.

Mendoza's contention that the prison did not warn inmates that their calls could be disclosed to the government is of no moment. He cites no authority indicating that such a warning—or the absence of one—bears on the admissibility of recorded prison calls, and the court has located none. Because inmates who are on notice that their calls are monitored and recorded have no reasonable expectation of privacy in those communications, the government was not required to obtain a warrant to access those calls, regardless of whether inmates were specifically advised that those calls could be disclosed to the government. See, e.g., Shavers, 693 F.3d at 389; Jarmon, 14 F.4th at 272-73.

Accordingly, Mendoza's motion to suppress his recorded prison calls is denied.

## III. <u>Conclusion</u>

For the reasons outlined above, the court will deny Mendoza's motion to suppress statements and prison calls. (Doc. 51). An appropriate order shall issue.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated:     May 14, 2026